# United States District Court

_____ EASTERN _____ DISTRICT OF _____ MISSOURI _____

**In the Matter of the Search of**
(Name, address or Brief description of property or premises to be searched)

S&H Parking System and St. Louis Metropolitan Towing,
1325 North 10th Street, St. Louis, Missouri

**APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT**

**CASE NUMBER:**  4:08MJ1204 TIA

I Daniel A. Netemeyer being duly sworn depose and say:

I am a Special Agent for the Federal Bureau of Investigation and have reason to believe that on the property or premises known as
(description and/or location)

S&H Parking System and St. Louis Metropolitan Towing, 1325 North 10th Street, St. Louis, Missouri, which is more fully described in Exhibit 1.

in the _____ EASTERN _____ District of _____ MISSOURI _____ there is now concealed a certain person or property, namely (describe the person or property to be seized)

**See Attachment A**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

1) property that constitutes evidence of the commission of a criminal offense or; 2) contraband, the fruits of a crime, or things otherwise criminally possessed, or; 3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

concerning a violation of Title 18 USC, Sections 1341, 1343, 1346, 1956 and 1957 and Title 26, USC, Section 7201.
The facts to support a finding of Probable Cause are as follows:

**See Attached Affidavit**

Continued on the attached sheet and made a part hereof.    **X** Yes _____ No

Signature of Affiant
Daniel A. Netemeyer
Special Agent for the Federal Bureau of Investigation

Sworn to before me, and subscribed in my presence

August 12, 2008
**Date**

at    St. Louis, Missouri
**City and State**

Terry I. Adelman
United States Magistrate Judge
**Name and Title of Judicial Officer**

Signature of Judicial Officer

## AFFIDAVIT

I, Daniel A. Netemeyer, Special Agent, Federal Bureau of Investigation, (hereinafter FBI), being duly sworn and deposed, state the following:

## I. INTRODUCTION

1. I have been a Special Agent of the FBI for the past eleven and one half years. Prior to becoming a Special Agent with the FBI, I was a police officer for the City of Collinsville, Illinois Police Department for eight years. I am currently assigned to the FBI - St. Louis Division's Public Corruption Squad. The information contained in this affidavit is based on my personal knowledge, the knowledge of other law enforcement officers, and the knowledge of witnesses. I have received training in the identification and enforcement of federal laws associated with fraud, tax evasion, money laundering and bribery. In connection with my duties and responsibilities as a law enforcement officer, I have testified in judicial proceedings and prosecutions of violations of the aforementioned criminal acts. I have participated in numerous significant investigations involving these activities which resulted in convictions of individuals and the seizures of substantial sums of property and currency. My investigations have kept me in close contact with other agents investigating these criminal activities.

2. I submit this Affidavit in support of my belief that there is probable cause to believe that the property and items enumerated herein and in Attachment A to this Affidavit, are to be found on the premises of St. Louis Metropolitan Towing and S&H Parking System, both located at 1325 North 10th Street, St. Louis, Missouri; Parks Auto Sales, located at 1411 East 14th Street, St. Louis, Missouri; and MoJo's Towing, located at 12204 Old Big Bend, Kirkwood, Missouri. Due to the inter-relationship of the aforementioned businesses and shared use of office space and lots for vehicle sale or storage, the Affiant anticipates that vehicles and or documents from each of the aforementioned business entities may be stored at any of the business locations identified herein.

3. William and Kenneth Bialczak, brothers, are the registered owners of S&H Parking System, which serves as the parent company to St. Louis Metropolitan Towing, Parks Auto Sales, MoJo's Towing, and other local businesses. S&H Parking System is located at 1325 North 10th Street, St. Louis, Missouri. The business activities of S&H Parking System and its affiliated businesses are run by William and Kenneth Bialczak. St. Louis Metropolitan Towing is also located at 1325 North 10th Street, St. Louis, Missouri. Until very recently, St. Louis Metropolitan Towing had a contract with the St. Louis Metropolitan Police Department to tow vehicles designated by the police department. Parks Auto Sales is located at 1411 East 14th Street, St. Louis, Missouri. During the past several years, Parks Auto Sales has titled and sold a large number of vehicles towed by St. Louis Metropolitan Towing at the direction of the St. Louis Metropolitan Police Department. MoJo's Towing is located at 12204 Old Big Bend Road, Kirkwood, Missouri. Greg Shepard is employed by the Bialczak brothers as the General Operations Manager for S&H Parking and its affiliated businesses. Shepard is a former police officer with the St. Louis Metropolitan Police Department.

4. To date, this investigation has revealed that various employees of S&H Parking (hereinafter S&H) and its affiliated businesses appear to be engaged in fraudulent activities. These fraudulent activities include, for example, the improper titling of vehicles towed and stored at the aforementioned locations. Employees of S&H and its affiliated businesses have solicited the cooperation of at least one St. Louis Metropolitan Police Department Police Officer, Kevin Shade, to conduct fraudulent inspections on vehicles to allow S&H and its affiliated businesses to obtain new original titles, commonly referred to as "green" titles, for the towed/stored/abandoned vehicles. Through the issuance of an original title, the holder of such title, Parks Auto Sales, is entitled to up to 100% of the Blue Book Value of the vehicle. Vehicles which are not titled with an original title are commonly branded "prior salvage" or "abandoned" and valued, according to an industry standard, at 50% of Blue Book Value. These fraudulent applications for title are sent through the United States Postal Service by S&H and its affiliated businesses.

5. Additionally, as another example, S&H and its affiliated businesses has several on-going contracts with nationwide rental car companies. These contracts allow S&H and its affiliated businesses to provide towing service on an as needed basis for several rental car companies. S&H and its affiliated businesses are paid fees based on the resources used to facilitate a tow and for mileage associated with the towing of a vehicle owned by a rental car company. More than one St. Louis Metropolitan Towing driver has stated they are prohibited from writing the mileage for a tow on the "tow ticket". Instead, they have been instructed to write the mileage from the tow above the perforation so the mileage can later be inflated by employees of S&H and its affiliated businesses. The bill for the tow is then sent to the appropriate rental car company either by facsimile, by the United States Postal Service or other common carrier.

## II. FRAUD SCHEME

6. My training and participation in investigations of others involved in illegal businesses and activities have given me knowledge to recognize the methods used by persons committing criminal activities to conceal their assets, income and activities from government and other third parties. Based on my training and experience, I know the following:

(a) that individuals acting on behalf of a business or corporation can generate tremendous profits from illegal activities. These individuals and businesses attempt to hide their illegal activities to avoid detection by law enforcement agencies;

(b) that these individuals acting on behalf of a business or corporation often place assets, purchased by them, in names other than their own to avoid detection of these assets by law enforcement agencies;

(c) that even though these assets may be in other persons names, the individuals committing illegal acts continue to use these assets and exercise control over them;

(d) that individuals committing illegal activities must maintain large amounts of currency readily accessible to them in order to maintain and finance their ongoing illegal activities;

(e) that individuals committing illegal acts maintain books, records, receipts, bank statements and records, money drafts, letters of credit, money orders, cashiers checks, documents relating to safe deposit boxes and other documents evidencing the acquisition, secreting, transfer, and concealment of assets and currency. These records are maintained at places such as their residence or a residence, a business, computer or safe deposit boxes where the individual has immediate access to these documents and where they are concealed from law enforcement authorities;

(f) when individuals committing illegal acts accumulate profits from fraud, they frequently try to legitimize those profits. In order to accomplish this, they co-mingle income from the illegal activity with money from a legitimate business or businesses.

(g) that individuals committing illegal acts engage in money laundering activities by structuring deposits in personal and business accounts that are just below federal reporting requirements in order to prevent necessary paperwork to be filled out and to conceal the deposits from law enforcement authorities.

(h) that individuals committing illegal acts use cash to pay for items relating to the illegal activity in order to launder money and to falsely deflate gross sales amounts and prevent the payment of sales tax on sold items.

(i) that individuals committing illegal acts pay cash to their employees in order to launder money and to prevent the payment of federal income tax and to avoid the necessary reporting requirements relating to federal tax laws.

(j) that individuals committing illegal acts commonly maintain addresses or telephone numbers in books or pages which reflect names, addresses, and/or telephone numbers of their associates and clients in their illegal activities, and maintain these records in a residence, place of business, computer, or in a safety deposit box where they are concealed from law enforcement authorities;

(k) that individuals committing illegal acts maintain safe deposit boxes as a place to store the large amounts of currency generated through the sale of illegal acts. Safe deposit boxes are used because the individual has immediate access to the contents of these boxes and the contents are concealed from law enforcement authorities.

7. During ▓▓▓▓▓▓▓, I along with other law enforcement agents, began an investigation into the illegal activities of S&H and its affiliated businesses, as well as the Bialczak brothers, Greg Shepard, and various other employees. The investigation was centered around complaints that S&H and its affiliated businesses are improperly towing, storing, titling and selling vehicles. Based on the results of the investigation to date, it is your Affiant's belief that probable cause

exists that William Bialczak, Kenneth Bialczak, Greg Shepard, Kevin Shade and others known and unknown, in concert with each other, have knowingly and intentionally engaged in mail fraud, wire fraud, federal tax evasion, money laundering activities and conspiracy in violation of Title 18, United States Code, sections 371, 1341, 1343, 1346,1956 and 1957 and Title 26, United States Code, Section 7201.

8.  As a result of my personal participation in this investigation, in reports made to me by other law enforcement officers, cooperating informants, and other concerned parties, I am familiar with the circumstances surrounding the facts detailed in this affidavit.  Based on this familiarity, I allege that information in this affidavit shows that there is probable cause to believe that the subject properties have been used, and are currently being used, to store documents, records, instrumentalities and evidence relating to the mentioned illegal activities associated with S&H and its affiliated businesses owned and managed by the Bialczak brothers and others known and unknown.

9.  During the course of the investigation, your Affiant, along with other law enforcement officers interviewed ███████████ who is ████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████  The vehicles are described as follows:

   (a)  Tan 1998 Chevrolet Truck, vehicle identification number ████████████████ - good condition;

   (b)  Red 1997 Oldsmobile Delta 88, vehicle identification number ████████████████ - ignition punched, broken windshield, front end damage, inoperable motor (hole in engine block);

   (c)  Blue 1996 Pontiac Grand Am, vehicle identification number ████████████████ - vehicle body in good condition, inoperable motor (seized up engine).

In November, 2007, during a conversation with Greg Shepard, ████████ told Shepard that he was seeking "salvage titles" for all three aforementioned vehicles.  Shepard told ████████ that he had a better way to do it and instructed ████████ to fill out all required forms and to leave the section on the type of title sought, blank.  During the course of this process, Detective Kevin Shade of the St. Louis Metropolitan Police Department arrived on the lot of ████████████████ ████████████████ to perform vehicle inspections on all three vehicles.  According to ████████████████, Shade was on the lot for a total of 10 to 15 minutes and did nothing more than verify the vehicle identification numbers on all three vehicles.  According to the Missouri Highway Patrol, a typical vehicle inspection for titling purposes takes 30 - 45 minutes, and includes a complete inspection of the interior and exterior of the vehicle, an inspection of the vehicle's engine and systems, and the inspection and recording of identification numbers for the vehicle,

the vehicle's engine, and the vehicle's transmission. Several days following Shade's visit to ████, Shepard provided ████ with a United States Postal Service Express Mail envelope with original "green" titles on all three vehicles. According to ████, the only vehicle that was of any use was the Chevrolet truck which is currently being driven by his son. The Pontiac and the Oldsmobile were inoperable and taken directly to a junk yard.

10.   Your Affiant interviewed ████████ indicated his family owned business has been doing business with the Bialczaks and S&H for decades. ████, on occasion, has been in need of titling work for vehicles that have come through his business. ████ found the titling process to be difficult and lengthy. Over time, he turned to S&H and its affiliated businesses and, in particular, Greg Shepard, to do his titling work. According to ████, S&H and its affiliated businesses could get a "green" title on vehicles so they could be sold to someone other than a junk yard for much more money. ████ had Shepard obtain "green" titles for ████████ on numerous occasions over the past several years. In December, 2007, ████ purchased several 18 wheeler trailers from Super Valu Grocery Stores. Two of the trailers did not have titles for them. The two trailers are described as:

(a) White 1994 Wabash Semi-Trailer, vehicle identification number ████.

(b) White 1995 Wabash Semi-Trailer, vehicle identification number ████.

████ knew at the time of purchase he could get titles through Shepard at S&H. Upon purchasing the trailers, ████ contacted Shepard to provide him with the vehicle identification numbers for the trailers for titling purposes. ████ then received "green" titles for both trailers from Shepard. ████ was aware that as part of the process to obtain "green" titles, the subject vehicle must be inspected by a trained authorized law enforcement officer certified to do vehicle inspections. ████ typically contacted Detective Kevin Shade of the St. Louis Metropolitan Police Department's Auto Theft Bureau to do these inspections. To ████ knowledge, Shade did not do an on-site inspection of the two trailers. In order to receive the "green" titles for the trailers, the applicant is required to fill out paperwork which is to be submitted to a Title Service and to the Missouri Department of Revenue. Your Affiant showed ████ a series of documents associated with the application and subsequent issuance of the titles for the two aforementioned trailers. The documents were a Missouri Department of Revenue form108A (Application for Missouri Title and License), Missouri Department of Revenue form 551 (Vehicle Examination Certificate), Missouri Department of Revenue form 4579 (Abandoned Property Bill of Sale). All forms indicated ████ signed the forms. ████ stated he did not sign any of the forms and the forms must have been forged by someone from S&H and its affiliated businesses. Furthermore, ████ did not purchase the vehicles as abandoned property from the St. Louis Metropolitan Police Department as indicated on two of the Department of Revenue's forms 4579, thus ████ advised that the two forms were false.

11.  Your Affiant interviewed ███████████████ as part of this investigation. ███████
purchased a 2006 Chevrolet Trailblazer at Royal Gate Dodge on April 5, 2008. ███████ applied
for title through the dealership and was given a temporary registration tag.  Later that evening,
███████ former boyfriend took the vehicle without permission.  The vehicle was eventually
towed to S&H and its affiliated businesses on April 10, 2008. ████████ made numerous
attempts to locate the vehicle with law enforcement officers without success.  On May 26, 2008,
███████ was told by law enforcement authorities the vehicle was at St. Louis Metropolitan
Towing. ███████ contacted St. Louis Metropolitan Towing to inquire about her vehicle.  She
was told the towing and storage fees had accumulated to over $1,800.00.  She was also told she
would have to pay the fees and secure registration in order to obtain her vehicle. ████████ began
making arrangements to obtain funding to pay for the fees and registration. ████████ recontacted
St. Louis Metropolitan Towing in early June, 2008 to check the storage fees due.  She was told
the fees were now over $4,000.00 and the vehicle had been repossessed by Capitol One (her
finance company).  Your Affiant has been  provided a list of title applications currently pending
for S&H and its affiliated businesses by Linda Petersen of the Missouri Bankers Association.
The ████████ vehicle was on the list which indicated Parks Auto Sales purchased the vehicle
from the St. Louis Metropolitan Police Department - Board of Police Commissioners on July 14,
2008 for $2,200.00.  The associated paperwork shows the application was for an original title.
The paperwork also showed the vehicle was inspected by Detective Kevin Shade.  Your Affiant
contacted Capitol One Operations Center and was told by an Operations Specialist they have not
repossessed the vehicle.  The Operations Specialist further stated they did not began the
repossession process until August 5, 2008 and have yet to make a formal request for the vehicle.
Numerous other individuals have been interviewed and advised that they had vehicles towed by
St. Louis Metropolitan Towing at the direction of the St. Louis Metropolitan Police Department
during the past several years.  These individuals had difficulty getting answers from Shepard and
employees of S&H and its affiliated businesses concerning their towed vehicles, and several had
experiences similar to ██████████████ in that they received false information about their
vehicles and ultimately were unable to reclaim their vehicles.

12.  According to the Missouri Department of Revenue, "junk" titles are issued on
vehicles whose repair costs far exceed the actual value of the vehicle and are in disrepair.  These
vehicles are taken to salvage yards and used for parts or are destroyed.  "Salvage" titles are issued
on vehicles that are in working condition and have some value to them.  Typically, a salvage title
contains a brand which indicates the vehicle at some point was in salvageable condition and is
operable.  This indicates to a potential owner there may be some parts that are not original to the
vehicle, the vehicle may have been wrecked, or the subject of a major repair.  According to the
industry standard, a vehicle that has had a title branded as "prior salvage" has a maximum value
of 50% of the blue book value for a similar vehicle with an original unbranded "green" title.  An
unbranded "green" title on a vehicle allows an owner up to the full blue book value of the
vehicle.

13.  In order for a vehicle to receive a "green" unbranded title, the application for title
must contain a completed form 551 which is a Missouri Department of Revenue Vehicle
Examination Certificate.  Typically, these inspections are conducted by the Missouri Highway
Patrol.  In recent years, a provision in the Missouri State Statutes has expanded the inspection

process to allow the City of St. Louis and St. Louis County to conduct their own inspections on vehicles seeking original titles.

14.  Your Affiant conducted interviews of personnel from the Missouri Highway Patrol responsible for supervising vehicle inspections. The condition of the Oldsmobile described above in paragraph 9(b) and of the Pontiac described above in paragraph 9(c) was outlined to Missouri Highway Patrol Inspection Supervisor Harris. Supervisor Harris stated all four of the defects indicated on the Oldsmobile individually were grounds for failing the inspection. Supervisor Harris indicated the defect listed on the Pontiac was also grounds for failing the inspection. Supervisor Harris further stated vehicles have to have an exterior that is in good condition, and the vehicle must be in running order. According to ████████, neither vehicle met that criteria.

15.  Your Affiant interviewed St. Louis Police Officer ████████in July, 2008. In either 2000 or 2001, ███ purchased a vehicle from Parks Auto Sales. ███ dealt with Greg Shepard during the purchasing process. ███ purchased a 1992 Toyota Celica for (to the best of his memory) for either $300.00 or $500.00. ███ stated the vehicle was "a piece of junk" and had to be towed to his residence so he could totally refurbish it. After purchasing the vehicle, ███ got an original unbranded title through Shepard concealing the fact that the vehicle at one time was in salvageable condition. Approximately one year later, and after he refurbished the vehicle, ███ sold the vehicle for $2,100.00. During the sale, ███ had the vehicle inspected by the Missouri Highway Patrol. The vehicle passed the inspection. He then turned over the original title to the new owner.

16.  Linda Petersen, manager for the Missouri Bankers Association's Title Service in Jefferson City, Missouri was interviewed. Petersen stated she first started processing titles for Parks Auto Sales in 2001. Over the years, Petersen has dealt directly with Greg Shepard as the representative for Parks Auto Sales. Peterson's job was not to issue titles, but to process title paperwork based on the information provided to her by the applicant for title. Petersen stated the overwhelming majority of applications for title from Park Auto Sales are for green unbranded titles. Submitted with each Parks Auto Sales application for title is a Missouri Department of Revenue form 4579, being an abandoned property bill of sale, and a Missouri Department of Revenue 551 vehicle inspection certificate. Petersen receives her applications for title from Parks Auto Sales via the United States Postal Service. Upon receipt of the titles from the Missouri Department of Revenue, Petersen sends the titles to Parks Auto Sales via the United States Postal Service.

17.  Over the course of this investigation, allegations of improper billing to rental car companies by S&H and its affiliated businesses have been investigated. ████████, a former tow truck driver for S&H and its affiliated businesses was interviewed. ███ was employed as a tow truck driver with S&H and its affiliated businesses during the period November, 2006 through July, 2007. During this period, ███ responsibilities included towing rental vehicles owned by Hertz, Budget and Avis that were disabled or had been in an accident. S&H and its affiliated businesses had contracted with each entity for such service. Under the agreements, the disabled vehicles were towed to S&H and its affiliated businesses's lot at 1325 N. 10th Street, St. Louis,

Missouri. The tow truck drivers were specifically instructed by General Operations Manager, Greg Shepard not to record the mileage for the tow in the box provided for same on the tow ticket. Rather, Shepard instructed the tow truck drivers to record the mileage above the perforated line at the top of the tow ticket, which is not seen by the rental company. Shepard informed the drivers that only the rental vehicle's VIN should be recorded in the tow ticket. Shepard insisted that this protocol be followed by drivers and that he would personally handle completing the tow tickets. On one occasion in particular, in or about May, 2007, Shepard instructed ████ to retrieve an Avis rental vehicle that had become disabled near Springfield, Missouri. ████ located and towed the vehicle to S&H and its affiliated businesses's lot as instructed. ████ completed the tow ticket and inadvertently recorded the actual mileage of the tow from Springfield to St. Louis on the ticket. ████ submitted the tow ticket to Shepard who, upon reviewing same, berated ████ for incorrectly preparing the tow ticket. Shepard tore the tow ticket in half and instructed ████ to complete a new ticket without the mileage. ████ complied as instructed out of fear of retribution by Shepard. ████ opined that the protocol established by Shepard of not recording actual mileage on tow tickets for rental vehicles was suspicious. ████ further opined that such protocol existed solely to allow S&H and its affiliated businesses to inflate the mileage for towing on invoices submitted to Hertz, Budget and Avis.

18. ████████ was interviewed as part of this investigation. ████ was employed as a tow truck driver with S&H and its affiliated businesses during the period November, 2006 through May, 2007. During this period, ████ responsibilities included towing rental vehicles owned by Avis that were disabled or had been in an accident. S&H and its affiliated businesses had contracted with Avis for such service. Under the agreement, the disabled Avis vehicles were towed to S&H and its affiliated businesses's lot at 1325 N. 10th Street, St. Louis, Missouri, and then eventually to Avis' lot. The tow truck drivers were specifically instructed not to record the mileage from the location the Avis rental vehicle was retrieved to S&H and its affiliated businesses's lot on the tow ticket. Rather, the tow truck drivers were instructed to record the mileage above the perforated line at the top of the tow ticket, which is not seen by the rental company. The drivers were allowed to record only the vehicle's VIN and the Avis Rental Car Number in the tow ticket. S&H and its affiliated businesses insisted that this protocol be followed by drivers. ████ stated that his driver trainer was the individual at S&H and its affiliated businesses that instructed him to record the mileage on Avis tow tickets above the perforated line. ████ could not recall the name of such individual. ████ recalled that Greg Shepard at S&H and its affiliated businesses personally handled completing the tow tickets for Avis. ████ opined that the protocol established by S&H and its affiliated businesses of not recording actual mileage on tow tickets for Avis rental vehicles was suspicious. ████ further opined that such protocol existed solely for the purpose of allowing S&H to inflate the mileage for towing on invoices submitted to Avis.

19. Allegations of police misconduct have surfaced as part of this investigation pertaining to certain St. Louis Metropolitan Police Officers and their relationships with S&H and its affiliated businesses. Former S&H and its affiliated businesses tow truck driver and dispatcher ████████ was interviewed concerning these relationships. ████ stated ████████████████████████████████████ was a frequent visitor to S&H and its affiliated businesses. It was a standing order that when ████ was at S&H and its affiliated

businesses, all drivers were to stay out of the office until he leaves.  ▓▓▓▓ reported on one
occasion, he was bringing a tow onto the lot and entered the office via a back door.  At the time,
▓▓▓▓ was not aware that ▓▓▓▓ was on-site.  As ▓▓▓▓ entered the office he observed
▓▓▓▓ receive an envelope full of cash from the desk in the "money room".  The "money room"
or "green room" is the description commonly provided by employees of S&H and its affiliated
businesses where money is counted.  It is known to be located at the back of the office area at
1325 N. 10th Street.  ▓▓▓▓ believed Shepard was present when ▓▓▓▓ took the cash envelope.
Several other current and former employees of S&H and its affiliated businesses have also
advised that they were not permitted in the offices when ▓▓▓▓▓▓ was present during his
frequent visits.

    20.  During the aforementioned interview with ▓▓▓▓, he indicated tow drivers for
S&H and its affiliated businesses are given a cash bonus for each tow sheet they properly
complete.  These payments are made by Shepard and are distributed via an envelope on
Tuesdays.  The envelopes are stored in a drawer in Shepard's desk.  ▓▓▓ has seen at least four
police officers receive envelopes from Shepard on the same days from the same desk drawer as
the cash bonuses paid to drivers.  ▓▓▓ described these officers as two white males and two black
males.  ▓▓▓ could not remember the names of the white male officers, but recalled the black
male officers were ▓▓▓▓▓▓▓▓▓▓▓▓▓.  Other witnesses have also advised that
numerous officers of the St. Louis Metropolitan Police Department have received multiple cash
payments from S&H and its affiliated businesses during the past several years.   In response to a
subpoena issued by the federal grand jury, the St. Louis Metropolitan Police Department
responded that none of its employees have been employed in secondary employment with S&H
and its affiliated businesses during the past eight years.

    21.  As part of this investigation, former S&H and its affiliated businesses tow truck
driver ▓▓▓▓ was interviewed.  During ▓▓▓▓ employment with S&H and its affiliated
businesses he recalled St. Louis Metropolitan Police Department officer ▓▓▓▓ would spend his
entire day towing vehicles to S&H and its affiliated businesses.  ▓▓▓▓ knew ▓▓▓▓ got $10.00 as
a "kickback" for each tow he sent to the lot of S&H and its affiliated businesses.  ▓▓▓▓ and other
drivers frequently joked around that ▓▓▓▓ was getting  his "bonus" from S&H and its affiliated
businesses every time he sent a vehicle to the lot.  On at least one occasion, ▓▓▓ observed
▓▓▓▓ receive an identical envelope to the envelopes the drivers got their cash bonuses in.  The
envelope was paid on Tuesdays which was the same day the drivers got their cash bonuses.

    22.  Former S&H and its affiliated businesses tow truck driver ▓▓▓▓▓▓▓ was
interviewed as part of this investigation.  ▓▓▓▓ stated tow drivers received a one dollar cash
bonus for each tow sheet that was filled out properly.  The cash bonus was paid on Tuesdays.
The envelopes were typically kept in Greg Shepard's desk area until they were distributed to
employees.  On more than one occasion, ▓▓▓▓ observed an envelope in the drawer for Officer
▓▓▓▓.

    23.  During the aforementioned interview with ▓▓▓▓▓▓, it was determined that
▓▓▓▓ has paid St. Louis Metropolitan Police Officer Detective Kevin Shade for vehicle
inspections.  The inspections were conducted through the course of Shade's duty as a member of

the Auto Theft Bureau. ████ stated he paid Detective Shade fifty dollars cash on approximately two occasions and provided Shade with St. Louis Rams Football tickets on five to ten occasions.

24.  At least one witness interviewed stated S&H and its affiliated businesses is currently storing records in a "box truck" located on the lot at S&H and its affiliated businesses. This creates the potential for making the records immediately mobile.

25.  ████████, a current tow truck driver for S&H and its affiliated businesses was interviewed as part of this investigation. ████ was working on one of the days following a series of recent news articles addressing potential improper relationships between former St. Louis Metropolitan Police Department Chief Joseph Mokwa and S&H and its affiliated businesses. ████ observed that two pallets of records were shrink wrapped and placed in a warehouse. ████ openly asked if the records were going to be destroyed before the FBI comes. ████ stated this question drew a suspicious no response from management at S&H and its affiliated businesses. It appears S&H and its affiliated businesses is in the process of hiding or destroying records to prevent their detection and review by law enforcement authorities.

26.  As part of this investigation, St. Louis Metropolitan Police Department Internal Auditor Ken Stone was interviewed. Stone stated that in April of 2008, he began an internal audit of vehicles on the lot of S&H and its affiliated businesses that were towed by the City of St. Louis for asset forfeiture purposes. Stone sent S&H and its affiliated businesses a request for records in order to explain several discrepancies he had discovered during the initial phases of the audit. In response to Stone's request, S&H and its affiliated businesses sent documents that were not requested that had several portions of the document redacted out. According to Stone, S&H and its affiliated businesses did not fully cooperate with his request for records.

27.  On August 4, 2008, ████████ contacted your Affiant with information relative to this investigation. ████████ had a conversation with an associate of his who once worked for ████████. The associate is still employed at ████. The associate indicated to ████ that several S&H and its affiliated businesses documents were recently boxed up and moved to ████████. The associate further informed ████ that S&H and its affiliated businesses has installed a more sophisticated video surveillance system which allows them to view activities at Mo-Jo's from the St. Louis office of S&H and its affiliated businesses. The associate also informed ████ that Greg Shepard may have been transferred to the Mo-Jo's location.

## III.  INFORMATION RELATIVE TO TAX VIOLATIONS

28.  To date, this investigation has revealed employees of S&H and its affiliated businesses appear to be engaged in fraudulent activities which include but are not limited to improper titling of vehicles towed and stored at St. Louis Metropolitan Towing, fraudulent inspections by a St. Louis Police Department Detective, sale of vehicles which are improperly titled, employment of St. Louis Police Department officers for the purpose of illegal towing

activities, and cash payments to the aforementioned police officers. Witnesses have informed investigators of what is commonly referred to as the "green room" located in the S&H and its affiliated businesses office at 1325 N. 10th Street where large amounts of cash is kept under lock. The presence of large amounts of cash kept at the business would indicate that these funds are going largely unreported on the business returns. All of the above named fraudulent and illegal activities take place at businesses and on properties owned by Kenneth and William Bialczak. The Bialczaks have a close, personal relationship with



29. The Bialczaks have filed and are current on their personal and business returns for each of their four partnerships (St. Louis Metropolitan Towing, Parks Auto Sales, ParkCo Properties and Park One LLC). Income and/or losses from their businesses are reported on K-1s which then flow through to their personal Form 1040 U.S. Individual Income Tax Returns. Therefore, any inflation of expenses or under reporting of income would flow through to the Bialczaks' personal returns rendering them false.



30. The Bialczaks also employ Greg Shepard, a retired St. Louis police officer, who works as general operations manager for St. Louis Metropolitan Towing and Parks Auto Sales. Shepard is also known to have a close, personal relationship with ▮▮▮▮▮▮▮▮▮▮ was seen meeting with the Bialczaks and Shepard on numerous occasions at the S&H and its affiliated businesses offices during the past several years. Shepard has been known to brag about a "six figure salary" which he makes working at S&H and its affiliated businesses. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Individuals interviewed during the investigation have stated Shepard drives either a new truck or Cadillac and his wife drives a sport utility BMW, all with dealer plates. A check of St. Louis County records indicate the only vehicles registered in either Shepard or his wife's name are three trailers and a recreational vehicle which suggest Shepard and his wife are driving vehicles from Parks Auto Sales without purchasing them.

31. I know from my experience in investigating federal tax evasion and money laundering, individuals who are involved in illegal businesses practices and activities often attempt to hide their actions by failing to deposit cash receipts, keeping a second set of books, purchasing assets with the illegal proceeds and placing them in names of others, and by co-mingling those funds with money from a legitimate source, and cash payments to employees in order to avoid payment of federal income tax. Tax related documents that your Affiant would expect to be found at the search locations include but are not limited to: Forms W-2, W-4 or 1099s, work schedules of employees, cash receipt/disbursement ledgers, receipts for payment of

storage/towing, sale of vehicles, dealership sale records, and other records kept in the normal course of business.

32.  Relative to the allegations concerning the submission of false and fraudulent vehicle title applications, and based upon the investigation to date, your Affiant believes that one or more of the subject vehicles are currently located upon the premises of S&H and its affiliated businesses, as well as at MoJo's Towing.  An inspection of these subject vehicles by law enforcement is necessary in order to determine the vehicles' condition and exact identification.

33.  Due to the sensitive nature of the investigation, your Affiant is requesting this Affidavit for search warrant be kept under seal.  This request is made to help preserve the safety and protect the identity of witnesses and to preserve the evidence located at the search locations identified herein.

## IV.  NEED FOR ELECTRONIC DATA AND COMPUTER RECORDS

34.  Based on your Affiant's knowledge, training, experience, and the knowledge, training, and experience of agents and investigators with expertise in computer and electronic/digital evidence, your Affiant is aware of the following:

(a)    Several witnesses have advised that S&H and its affiliated businesses use computers and computer systems, located in the businesses' offices, in the day to day activities of the businesses.

(b)    Volume of evidence: Computer storage devices (such as hard disks, hard drives, diskettes, tapes, CD's, DVD's, and thumb drives) can store the equivalent of thousands of pages of information.  Additionally, a suspect may try to conceal criminal evidence, he or she might store it in random order with deceptive file names.  This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime.  This sorting process can take weeks or months, depending on the volume of data stored, and it may be impractical to attempt this kind of data search on site.

(c)    Searching a computer system for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data.  In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction, a controlled environment is essential to its complete and accurate analysis.

(d)    Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet.  Electronic files downloaded to a hard drive can be stored for years at little or no cost.  Even when

such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or recovery file. Thus, the ability to retrieve residue of an electronic file from a hard drives depends less on when the file was downloaded or viewed than on a particular operating system, storage capacity, and computer habits.

(e)     Searching computer equipment for evidence described can require a range of computer forensic analysis techniques. Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to avoid detection; or take other steps designed to frustrate law enforcement searches for information. Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of selected files to determine their contents, scanning for deleted or hidden data, and searching for key works or phrases ("string searches"). Accordingly, your Affiant requests permission to use whatever computer forensic analysis techniques appear necessary to locate and retrieve the evidence described in Attachment A.

(f)     If "imaging" proves impractical, or even impossible for technical reasons, then the agents will seize those components of S&H and its affiliated businesses computer system that the computer forensic examiner believes must be seized to permit the agents to locate the applicable files at an off-site location. The components will be seized and taken into the custody of the agent. If employees of S&H and its affiliated businesses so request, the computer forensic examiner will, to the extent practicable, attempt to provide the employees with copies of any files not within the scope of the warrant that may be necessary or important to the continuing function of S&H and it affiliated businesses legitimate business.

## V. DESCRIPTION OF SEARCH LOCATIONS

35.     This Affiant is requesting to search the following locations:

(a)     St. Louis Metropolitan Towing, a limited liability company, is located at 1325 North 10th Street, St. Louis, Missouri which is in the Eastern District of Missouri. The corporation filed its Articles of Organization with the Secretary of State of Missouri on December 10, 1997. According to witness information, the company is owned and operated by William Bialczak and Kenneth Bialczak. St. Louis Metropolitan Towing operates out of a red brick building located behind a cement wall with razor wire facing 10th Street. A gate opening onto 10th Street bares a blue rectangular sign with white lettering which states "1325 North 10th Street." Below the blue and white sign is a large yellow sign with red lettering which states

"Impound, Police, Vehicle Auction."  Just inside the gate to the left is a large blue trash dumpster.  The large red brick building has several large brown bay doors.  There is a white tank and two soft drink vending machines in front of the northeast side of the building which has some blue siding.

   1)  Witness information provided that vehicles towed by St. Louis Metropolitan Towing may be stored at the 1325 North 10th Street location or driven to large lots at Park Auto Sales' property located at 1411 East 14th Street, St. Louis, Missouri.

   2)  Witness information further states that documents for St. Louis Metropolitan Towing may be stored in the shop area of the building or temporarily in a large "box" truck while construction in the shop area is being performed.  Therefore, the search will include the office area, storage area, shop area, and any other temporary storage area to include "box" trucks, service vans, or trailers located at 1325 North 10th Street, St. Louis, Missouri.

   (b) S&H Parking System, a limited liability company, is located at 1325 North 10th Street, St. Louis, Missouri which is in the Eastern District of Missouri.  The corporation filed its Articles of Organization with the Secretary of State of Missouri on December 30, 1993.  On January 1, 1994, filed its registration of Fictitious Name with the Secretary of State of Missouri, listing Stanley Bialczak, Kenneth Bialczak, and William Bialczak as each holding a 33% ownership in the company.  S&H Parking System operates out of the same building and grounds as described above for St. Louis Metropolitan Towing.

   1)  Witness information states that documents for S&H Parking Systems may be stored in the shop area of the building or temporarily in a large "box" truck while construction in the shop area is being performed.  Therefore, the search will include the office area, storage area, shop area, and any other temporary storage area to include "box" trucks, service vans, or trailers located at 1325 North 10th Street, St. Louis, Missouri.

   2) Exhibit 1 attached to this Affidavit is an aerial photograph demarking the St. Louis Metropolitan Towing and S&H Parking System property at 1325 North 10th Street, St. Louis, Missouri.

   (c) Parks Auto Sales,  an entity which is not registered as such with the Secretary of State of Missouri, is located at 1411 East 14th Street, St. Louis, Missouri, and may also have the mailing address of 1410 North 14th Street, St. Louis, Missouri, which is in the Eastern District of Missouri.  According to witness information, the business is owned and operated by William Bialczak and Kenneth Bialczak. Parks Auto Sales is a large compound of parking lots and buildings surrounded on three sides by a tall brown metal fence with razor wire.  The compound extends to 13th Street to the east, Biddle Street to the south, North 14th Street to the west, and a portion extends almost to Cass Street to the north.  Located at 13th and O'Fallon Street is the main entrance gate.  On the left side of the gate is a large white sign with black lettering which reads "Towing Facility Yard 2."  Looking in through the gate, one can see a guard tower and building to the left, surrounded by parking lots. From the North 14th Street side of the compound, there is a small brown brick office front with a brown awning.  The number "1410" is

painted in blue on the door. To the right of the door is a large light brown bay door.

        1) Exhibit 2 attached to this Affidavit is an aerial photograph demarking the Parks Auto Sales property at 1411 East 14th Street, St. Louis, Missouri.

        (d)     MoJo's Towing, which appears to have filed an Articles of Organization with the Secretary of State of Missouri on October 9, 2007, under the name of MoJo's Metro West Towing & Recovery, a limited liability company, operates at 12204 Old Big Bend Road, Kirkwood, Missouri. MoJo's Towing is located in the Eastern District of Missouri. According to witness information, the business is owned and operated by William Bialczak and Kenneth Bialczak. MoJo's Towing operates out of a gray vinyl sided building, with a sign attached facing Old Big Bend Road which reads "MoJo's Towing, 12204 Old Big Bend Road." A parking lot separates the building from a large white vinyl fence which runs along Old Big Bend Road.

        1) Witness information provided that paperwork and vehicles are routinely removed from MoJo's Towing and taken to either St. Louis Metropolitan Towing or Park Auto Sales.

        2) Exhibit 3 attached to this Affidavit is an aerial photograph demarking the MoJo's Towing property at 12204 Old Big Bend Road, Kirkwood, Missouri.

## VI. RESULTS OF PRIOR SEARCH

36.    On August 12, 2008, federal agents executed a search warrant at the premises of S&H Parking and St. Louis Metropolitan Towing at 1325 N. 10th Street, St. Louis, Missouri, Search Warrant 4:08MJ1195TIA. The agents observed in excess of approximately $500,000 in United States currency located in a safe on the premises. The currency was in various amounts and denominations and located haphazardly within envelopes, bank pouches, and boxes within the safe. In what was previously described in this Affidavit as the "Green Room", the agents observed in excess of approximately $100,000 in United States currency. The currency was in various amounts and denominations and located haphazardly within drawers and in plain view within the "Green Room". Finally, the agents observed in excess of approximately $50,000 in United States currency within the drawers of a desk located in the business office area. Again, the currency was in various amounts and denominations haphazardly within the drawers of the desk.

37.    As previously stated in this Affidavit, it is believed that large amounts of cash kept at the business would indicate that these funds are going largely unreported on the business tax returns, and on the tax returns of the owners of S&H and its affiliated businesses. It is further believed that the large amounts of cash observed within the business premises represent the proceeds of illegal actions, including fraud, money laundering, and tax evasion. A large amount of the currency located within the safe was packaged in separate envelopes, which is believed to facilitate the payments of bribes and kickbacks to St. Louis Metropolitan Police Department officers, as well as to make cash "off the book" payments to employees of S&H and its affiliated businesses, as previously detailed in this Affidavit.

# ATTACHMENT A

## LIST OF ITEMS TO BE SEIZED

1.    Any and all financial and business records relating to criminal violations referenced in the affidavit, including, but not limited to, the following:

(a)  General financial ledgers, cash receipts ledgers, cash disbursement ledgers, sales ledgers, accounts receivable ledgers, accounts payable ledgers, and payroll records.

(b)  Business records, to include minute books or other records reflecting ownership of the business and its assets and liabilities of the business.

(c)  Financial records showing income received and disbursements.

(d)  Bank statements, deposit slips, withdrawal slips, and canceled checks for any and all bank accounts, including all funds on deposit in money market accounts; cashier's checks; money orders; wire transfers; and certificates of deposit.

(e)  Corporate records of payments on personal, employee and non-employee credit cards, utilities, real estate or other outstanding financial obligation.

(f)  Personal individual/joint federal tax returns and work papers for William Bialczak, Kenneth Bialczak, and Gregory Shepard.

(g)  Corporate federal tax returns and work papers.

(h)  Receipts and invoices.

(i)  Contracts and correspondence, reflecting sales, rental, lease, consulting, sub-contractor agreements.

(j)  Business license applications and licenses.

(k)  Records reflecting bonuses or monetary compensation paid to management, employees, part-time employees, and non-employees.

(l)   Records related to travel, including air travel receipts, hotel receipts, and meal receipts, relating to the criminal violations referenced in the affidavit.

(m)   Employee records, to include names and addresses

(n)   Records of employee, part-time employee, and sub-contractor work shifts and schedules.

2.    Any and all vehicle records related to criminal violations referenced in the affidavit, including, but not limited to:

(a) Inventory listings and vehicle records pertaining to vehicles towed, stored, recovered, transferred, conveyed, owned, sold or destroyed.

(b) Vehicle inspection records.

(c)  Vehicle registrations and related documents.

(d)  Vehicle titles, including the application for the title.

(e)  Certified mailings related to the notification of the registered vehicle owner.

(f)   Sales contracts of purchased and sold vehicles.

(g)  Contracts, agreements, and correspondence with the St. Louis Metropolitan Police Department for the use, sales, and purchase of vehicles.

(h)  Records pertaining to the possession and use of dealer tags.

(i)  Any and all records related to employees or non-employees that list names, addresses, and telephone numbers of the individual or their family members and associates who may be involved in the purchase or use of vehicles in furtherance of the fraud.

(j)  Correspondence, notes, formal complaints from individuals or entities on behalf of the individuals complaining about alleged abuses in their attempt to recover vehicles.

(k) Photographs of vehicles.

3.     Any appointment calendars, personal calendars, letters, notes, lists and correspondence, relating to criminal violations referenced in the affidavit.

4.     Keys belonging to and/or evidence of the existence and usage of any lockers, safe deposit boxes, storage facility, vehicle or other property, relating to criminal violations referenced in the affidavit.

5.     Any photographs and videotapes showing relationships between individuals or of vehicles involved in the fraud scheme.

6.     Any and all computers and any related items, whether in paper or magnetic form, containing information relating to criminal violations referenced in the affidavit, including but not limited to:

(a)  Any and all computer hardware, software, documentation, passwords, and data security, as described below:

(b)  Hardware - Computer hardware includes any and all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment that has remote access capabilities) including all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses. Hardware includes  any data processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections); as well as any devices,

mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

(c)   Software - Computer software is digital information that can be interpreted by a computer and any related components to direct the way they work.  Software is stored in electronic, magnetic, optical, or digital form.  It commonly includes programs to run operating systems, applications (like word processing, graphics, or spreadsheets programs), utilities, compilers, interpreters, and communication programs.

(d)   Documentation - Computer-related documentation consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, software, or other related items.

(e)   Electronically stored data - Any and all data concerning the criminal acts under investigation and any and all such data consisting of information stored on back-up tapes, , on computer hard drives, and/or any other form or manner.

(f)   Passwords and Data Security - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes.  A password (a string of alphanumeric characters) usually operates as a digital key to unlock or allow access to particular data security devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain preset security functions when activated or pressed.  Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

7.      All of the foregoing items of evidence described in paragraphs 1-6 in whatever

form and by whatever means such items may have been created or stored, including any hand-made form, any photographic form, any mechanical form, or any electronic, electrical, digital, or magnetic form, such as any information on an electronic or magnetic storage device like a floppy diskette, hard disk, back-up tape, CD-ROM, DVD, optical disk, electronic dialer, electronic notebook, or portable storage device, as well as printouts or readouts from such devices.

8.      United States currency believed to be related to criminal violations referenced in the Affidavit.